UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JACKIE EFFLER                               CIVIL ACTION

VERSUS                                      NUMBER: 08-1596

MICHAEL J. ASTRUE,                          SECTION: "B"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


**REPORT AND RECOMMENDATION**


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment[1]/ following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits. (Rec. docs. 14, 16 18).

Jackie Effler, plaintiff herein, filed the subject

_____

[1]/ As ordered by the Court on December 8, 2009, plaintiff filed his motion for summary judgment on February 20, 2009 but subsequently filed a memorandum in support of a motion to remand. (Rec. docs. 11, 14, 16).

applications for DIB and SSI benefits on April 3, 2006, alleging disability as of November 25, 2003. (Tr. pp. 77-81, 235-237). In an undated Disability Report that was, presumably, completed at that time, the conditions resulting in plaintiff's inability to work were identified as back, shoulder, and ankle problems and the traumatic amputation of three fingers. (Tr. pp. 98-105). Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on June 14, 2006. (Tr. pp. 73-76). Pursuant to plaintiff's request dated August 30, 2006, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on August 23, 2007 at which plaintiff, who was represented by counsel, and his father appeared and testified. (Tr. pp. 71-72, 17-43). On October 26, 2007, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 7-16). The Appeals Council subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 2-4). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his moving papers, plaintiff frames the sole issue for judicial review as follows:

> [i]s it reversible error for a presiding
> [A]dministrative [L]aw [J]udge to neglect to
> take vocational expert testimony in a [S]ocial
> [S]ecurity disability case if the claimant has
> impairments which are non-exertional in nature
> [?]

(Rec. doc. 16, p. 2).

Relevant to the issue to be decided by the Court are the following findings made by the ALJ:

1. [r]ecords from the Administration indicate that [c]laimant met the insured status requirements of the Act on the date he allegedly became unable to work, November 25, 2003, and that he will continue to meet them through March 2008.

2. [c]laimant engaged in substantial gainful activity in 2005; however, there is no indication of substantial gainful activity since 2005.

3. [c]laimant has the following "severe" impairments: a remote history of ankle injury with tendon repair and a remote history of traumatic amputation of the very tips of the second and third fingers of the left hand.

4. [t]he evidence does not establish that any impairment or combination of impairments meets or equals the criteria of any impairment set forth in Appendix 1, Subpart P, Regulations Part 404.

5. [c]laimant's allegations concerning his symptoms and limitations lack substantiation and credibility.

6. [c]aimant has the residual functional capacity to perform a full range of medium work.

7. [c]laimant is not able to perform his past relevant work.

8. [c]laimant is 30 years old with a ninth grade education and unskilled work experience.

9. [c]onsidering his age, education, past work experience,

and residual functional capacity, [R]ule 203.25 of the
Medical-Vocational Guidelines (Appendix 2, Subpart P,
Regulations Pt. 404) directs a finding of "not disabled".

(Tr. pp. 15-16).

Judicial review of the Commissioner's decision to deny DIB or
SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:
(1) whether substantial evidence of record supports the
Commissioner's decision, and (2) whether the decision comports with
relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292
(5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir.
1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the
Commissioner's findings are supported by substantial evidence, they
are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson
v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no
substantial evidence is appropriate only if no credible evidentiary
choices or medical findings exist to support the Commissioner's
decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).
Substantial evidence is more than a scintilla, less than a
preponderance, and is such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion. Jones v.
Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not
reweigh the evidence or try the issues de novo, nor may it
substitute its judgment for that of the Commissioner. Cook v.
Heckler, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the

4

evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work

5

that he has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the claimant carries that burden and successfully demonstrates that he is unable to perform the work that he has done in the past, the burden of proof shifts to the Commissioner at the fifth step to show that the claimant can perform other work in light of his age, education, work experience, and physical and mental limitations. Kramer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). In determining whether there is other work available that the claimant can perform, the Commissioner may rely exclusively on the Medical-Vocational Guidelines of the Regulations when the claimant suffers only from exertional impairments or when his non-exertional impairments do not significantly affect his residual functional capacity. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Fraga, 810 F.2d at 1304. Once the Commissioner demonstrates that the individual can

perform other work, the burden then shifts back to the claimant to rebut that finding.  <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988); <u>Fraga</u>, 810 F.2d at 1302.

At the time of the administrative hearing that was held on August 23, 2007, plaintiff was twenty-nine years of age, had completed eight years of formal education, and had past relevant work experience as a laborer, truck washer, mechanic's helper, plumber's helper, and warehouse helper.  Plaintiff lived in a mobile home adjacent to his father's house and shared joint custody of his four children, ages 12, 8, 7, 6, with his wife from whom he had been separated for four years.  On questioning by his attorney, plaintiff testified that he was unable to work due to back pain resulting from a motor vehicle accident that occurred on November 25, 2003.  The pain was bearable on some days and less so on others and plaintiff would sometimes hear a "pop" upon bending over and would be bed-ridden for three to four days.  After recuperating from his accident-related injuries, plaintiff was able to return, albeit briefly, to some light-level work and he continued to perform some light gardening work or odd jobs at the time of the hearing, getting paid by the project and earning $200 per month. When asked, plaintiff testified that he was not able to drive and did not own a car and thus relied on others for transportation.

The week prior to the hearing, plaintiff had reportedly

suffered a seizure and had to be transported to the emergency room for treatment. A CAT scan performed at the time revealed some abnormality on the left side of plaintiff's brain and he was instructed to follow-up with a neurologist within twenty days. Plaintiff testified that the recent seizure was the worst one he had experienced, that the episodes started following his accident and initially occurred every other month but had increased to monthly, and that he had recently suffered two seizures in one night. Plaintiff could feel a seizure coming on, would then get woozy, and would begin twitching. When such episodes occurred, plaintiff would lie down, eventually come to, and would then be dazed and confused for several hours. After experiencing a seizure, plaintiff would essentially be non-functional for the remainder of the day. Plaintiff testified that he had actually suffered a seizure while working at a light-duty job in Biloxi that paid full wages but with only minimal duties. Another seizure had reportedly occurred while plaintiff was working in Slidell and both of them possibly required hospital treatment. (Tr. pp. 19-27).

Upon being questioned by the ALJ, plaintiff admitted that he could drive if he had a driver's license. He testified that he began suffering from the seizures two or two and one half years prior to the hearing but subsequent to his motor vehicle accident. Plaintiff had been prescribed a thirty-day supply of Dilantin

following his seizure the week earlier but testified that he had actually taken the drug prior to that time, sporadically obtaining dosages from a cousin who had her own prescription. In addition to back and seizure problems, plaintiff suffered the traumatic amputation of the tips of three fingers in 1998, one of which was able to be re-attached, but he was unable to grip with the other two fingers due to tenderness. Plaintiff had no primary care physician whom he saw on a regular basis and simply visited the hospital for pain medication when his back became symptomatic.

In terms of daily activities, plaintiff testified that he rose at 6:30 a.m., saw his children off to school, and then did routine maintenance on his trailer or yardwork. As he testified to earlier, plaintiff would occasionally perform odd jobs but on the days when his back was worse he could not do much more than lie down for relief. Plaintiff cooked his own meals and did his own housework and laundry. He had no problems with walking, was unable to say how long he could stand, and experienced back pain after sitting for an unspecified amount of time, causing him to slouch for relief. Bending also caused problems but plaintiff estimated that he could lift up to one hundred pounds, although he had not attempted this repeatedly, and he had no problems with reaching. He played Frisbee and went fishing with his children. After being tendered back to his attorney, plaintiff testified that he could

lift his forty-pound children but that working a forty-hour work week could not be accomplished due to back pain and the recovery time required following a seizure. (Tr. pp. 27-37).

Plaintiff's father, Calvin Effler, was the second witness to take the stand. He testified that plaintiff's problems began after his car accident and that plaintiff had attempted to return to work but then began having seizures. Mr. Effler stated that he had actually witnessed plaintiff having a seizure, which he characterized as "light", and that he monitored plaintiff to make sure he did not swallow his tongue and was lying on his left side. However, plaintiff's last seizure had been a "big" one and had rendered him unable to function for two or three days thereafter. In terms of his back, Mr. Effler testified that plaintiff had good and bad days, that plaintiff would occasionally do odd jobs or landscaping for small sums of money, but that he was incapable of working a forty-hour work week. Seizures occurred at a rate of one per month and the intensity of the most recent one was sufficient enough for him to summon an ambulance. Mr. Effler testified that he would see to it that plaintiff follow-up with a neurologist as he had only been given a thirty-day supply of Dilantin. When asked whether he thought plaintiff was capable of driving, Mr. Effler recounted a presumably recent episode during which plaintiff was driving and felt a "light" seizure coming on and was able to pull

10

over and relinquish the driving duties to his cousin. (Tr. pp. 37-43).

As noted earlier, in his applications for Social Security benefits, plaintiff alleged that he became disabled and was unable to work as of November 25, 2003. However, his earnings records indicate that he earned $10,070.63 in 2005 which the ALJ correctly found to be an amount indicative of substantial gainful activity. (Tr. pp. 12, 82, 88, 91, 96). Earnings subsequent to 2005 were not indicative of substantial gainful activity.

The documentary evidence admitted in the administrative proceedings below begins with emergency room records from the North Oaks Medical Center dated July 23, 2003, several months before the alleged onset date, where plaintiff was seen for lower back pain following a lifting injury. He also complained of two fatty knots to his back. Seizure activity was negated in these records. The diagnosis was low back pain and plaintiff was prescribed Diflunisal and Flexeril and was instructed to use an ice pack and get bed rest as directed. (Tr. pp. 210-217). Plaintiff was next seen at North Oaks on August 13, 2003 for complaints of a painful abscess on the back for the previous two months. The diagnosis was a sebaceous cyst which was drained and plaintiff was prescribed Lortab and was discharged home in stable and improved condition. (Tr. pp. 204-209). Plaintiff returned to North Oaks on October 30, 2003 with

continuing complaints about the cyst. Once again, the site was drained and plaintiff was prescribed Bactrim DS and Vicodin and was discharged home in stable condition. (Tr. pp. 199-203).

Plaintiff was seen again at the North Oaks Medical Center Emergency Room on February 3, 2004 after being accidentally hit in the left knee with a baseball bat three days earlier. Plaintiff denied any previous knee problems. Following examination and x-rays, the knee was drained and dressed and plaintiff was advised to follow-up with an orthopedist. The diagnosis was a knee contusion and traumatic knee effusion. Plaintiff was prescribed Lortab and crutches and was to use ice packs to relieve the swelling. (Tr. pp. 191-198). Plaintiff was next seen at the North Oaks Emergency Room on June 25, 2004 for treatment of a laceration and a crushing injury after a transmission fell on his right hand. X-rays taken at the time showed no sign of fracture. Plaintiff's hand was sutured and he was discharged home in stable condition with a prescription for Lortab and to apply ice to the hand and to elevate it as needed. (Tr. pp. 185-190).

The next medical records were not generated until May 10, 2005 when plaintiff was seen at Lallie Kemp Hospital for further treatment of the cyst on his back which had become inflamed and painful. The area was treated once again and plaintiff was discharged in stable condition with prescriptions for Bactrim and

12

Vicodin. (Tr. pp. 173-176). On June 22, 2005, plaintiff was seen at the emergency room of the Garden Park Medical Center in Gulfport, Mississippi, after apparently suffering a generalized seizure in a parking lot where he was working as a contractor. Plaintiff's past medical history was said to be positive for previous seizures but he could not recall exactly when the last one was except that it was at least one month earlier. Plaintiff advised the emergency room physician that he drank every night, usually beer, but would not quantify the amount and that he had last consumed alcohol the previous evening. Laboratory analysis showed elevated liver function tests and plaintiff advised medical personnel that he wished to continue evaluation with his physician in Louisiana. The diagnosis on this date was acute generalized seizure, liver disease, and alcohol use. (Tr. p. 234).

Plaintiff returned to Louisiana and was seen at the Lallie Kemp Medical Center the following day. Plaintiff advised medical personnel there that he had gotten overheated from being outside the prior day and had experienced a seizure. He also related the previous day's concerns about his liver as well as back pain in connection with the fall. Plaintiff advised the attending physician that he consumed upwards of twelve beers per day. On physical examination, plaintiff had tenderness to palpation of the back bilaterally but x-rays were negative for fracture. The

13

diagnosis was a rib contusion; plaintiff was prescribed Tylenol for pain and was advised to stop drinking and to consume eight, eight ounce glasses of water per day. (Tr. pp. 170-172). Routine chemistry work was done on July 6, 2005. (Tr. p. 169).

On August 17, 2005, plaintiff returned to the North Oaks Emergency Room where he complained of a toothache for the previous three days. The assessment was a toothache and plaintiff was treated with Lortab and was given prescriptions for Penicillin and Vicoprofen. (Tr. p. 177-184). The next piece of documentary evidence in the record is the Administration's Adult Function Report dated April 18, 2006 which appears to have been completed on plaintiff's behalf by a family member or friend. On the form it was reported that plaintiff performed light housecleaning activities and did the laundry for two hours per week but that his activities were otherwise extremely limited by back trouble. (Tr. pp. 149-156).

On May 24, 2006, plaintiff was consultatively evaluated by Dr. Lance Caulfield. The chief complaint at the time was back pain which plaintiff related to the automobile accident several years earlier. Most of the pain was in the lower back with occasional radiation down the right leg. Plaintiff advised Dr. Caulfield that the back pain frequently left him bedridden but he had never had a complete work-up on his back although he had routine x-rays done

after the motor vehicle accident.  Plaintiff was on no medications at the time nor had he recently sought medical attention for his back. Plaintiff also complained of pain at the distal digits on the left as well as pain in the foot and ankle frequently.  Plaintiff denied alcohol use and he was not working at the time.  He also denied any history of motor weakness or sensory deficits, a history of seizure disorder, or headaches or dizziness.

On physical examination, the doctor noted that the distal tips of the digits of the left hand involving the second and third fingers were missing, apparently due to trauma, and that the fingertips appeared slightly tender.  There was tenderness to palpation noted along the lumbosacral spine and plaintiff was unable to get up and down off the examination table unassisted or to ambulate unassisted without an assistive device.  Nevertheless, the range of back motion appeared normal.  Neurologically, plaintiff was oriented to person, place, and time and was awake, alert, and able to answer all questions appropriately. Motor and sensory exams were normal in both the upper and lower extremities as were deep tendon reflexes and coordination.  Grip strength also appeared normal.  Dr. Caulfield's acute impression was pain involving the back and other musculoskeletal areas but with no previous evaluation or active medical therapy.  The chronic assessment was chronic back pain of uncertain etiology; automobile

accident with previous ankle injury and apparent tendon surgery;
apparent traumatic removal of the tips of two fingers of the left
hand; and, cigarette use. The doctor remarked that plaintiff's
back problems could best be addressed and improved following an
orthopedic evaluation but the physical examination results of that
day were unremarkable other than some tenderness subjectively to
palpation along the lower spine. (Tr. pp. 218-219).

On May 31, 2006 an Administration medical consultant reviewed
plaintiff's file and partially completed the Administration's form
denominated "Physical Residual Functional Capacity Assessment".
There, the consultant found that plaintiff could occasionally lift
fifty pounds and frequently lift twenty-five pounds; could sit,
stand, and/or walk for six hours per eight-hour workday; had an
unlimited ability to push and pull; could never climb a
ladder/rope/scaffolds but could frequently perform the other
enumerated postural maneuvers; had limited feeling but no other
manipulative limitations; and, had no visual, communicative, or
environmental limitations. This first consultant deferred to the
opinion of an orthopedist with regard to any manipulative
limitations plaintiff may have due to his missing fingertips. An
orthopedic specialist then reviewed plaintiff's file on June 13,
2006 and found that he was capable of medium-level work. (Tr. pp.
158-167). On April 20, 2007, plaintiff completed the

Administration's report denominated "Disability Report-Appeal", indicating therein that he had begun suffering seizures in April of 2006. There had been no change to plaintiff's back, shoulder, ankle, or finger problems which were reported in the Disability Report completed one year earlier. (Tr. pp. 126-130).

The final medical records admitted in the proceedings below document plaintiff's treatment at the North Oaks Medical Center Emergency Room on August 18, 2007 where he was transported via ambulance after reported seizure activity. Plaintiff advised EMS personnel that he had suffered seizures in the past but had never been diagnosed with any type of seizure disorder. EMS personnel observed no evidence of seizure activity; however, plaintiff had slurred speech, reportedly having consumed four beers earlier in the night, and had mild swelling to the eyes bilaterally. Alcohol was detected on plaintiff's breath but he was generally cooperative, alert, and oriented times three. There were no complaints of pain. When evaluated by medical personnel at the hospital, plaintiff advised that he had consumed only two beers earlier in the evening and that he had a history of seizures over the previous two years but no diagnosis. On neurological examination, plaintiff had normal strength and sensation bilaterally as well as normal speech and gait and no focal deficits. Blood testing conducted at the time revealed an alcohol

level of .309.  A CT scan of the brain without contrast revealed a small low density area in the left cerebral hemisphere felt to be a benign cyst, minimal generalized deepening of the cortical sulci, and no evidence of intracranial hemorrhage.  Plaintiff requested that the IV drip be removed from his arm and thus a dosage of Dilantin was administered orally.  The diagnosis was a seizure, not otherwise specified; plaintiff was discharged home to family members with a prescription for a thirty day supply of Dilantin, with instructions to consult with a neurologist within four to five days thereafter, and to avoid driving or activities at heights until follow-up with the neurologist. (Tr. pp. 221-232).

Plaintiff challenges the Commissioner's decision to deny Social Security benefits on only one ground, namely, that the ALJ erred in failing to elicit testimony from a vocational expert ("VE") at the hearing that was conducted on August 23, 2007, opting instead to utilize the Medical-Vocational Guidelines of the Regulations (i.e., the "Grids") in determining that he was not disabled despite the presence of a non-exertional impairment in the form of seizures.  The Court notes that Patricia Knight, a Vocational Expert, was present at plaintiff's hearing.  (Tr. p. 19). Plaintiff, who was represented by counsel, lodged no objection to the fact that she was not called to testify by the ALJ and counsel did not ask to call her himself.

As was discussed earlier, the Commissioner may rely exclusively on the Grids when the claimant suffers only from exertional impairments or when his non-exertional impairments do not significantly affect his residual functional capacity. Selders, 914 F.2d at 618; Fraga, 810 F.2d at 1304. Limitations are exertional if they affect the claimant's ability to meet the strength demand of jobs and they include capabilities such as sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. §404.1569a(b) and 416.969a(b). Non-exertional limitations are those that affect a claimant's ability to meet the demands of jobs other than strength demands. 20 C.F.R. §§404.1569a(c) and 416-969a(c). Examples of non-exertional impairments include a claimant's inability to function due to nervousness, anxiety, or depression; a claimant's difficulty maintaining attention or concentration; a claimant's difficult understanding or remembering detailed instructions; a claimant's difficulty in seeing or hearing; a claimant's difficulty tolerating some physical features of certain work settings; and, a claimant's difficulty performing the manipulative or postural functions of some work, such as reaching, handling, stooping, climbing, crawling, or crouching. 20 C.F.R. §§404.1569a(c)(i)-(vi) and 416.969a(c)(i)-(vi).

In evaluating plaintiff's challenge to the ALJ's decision, the

Court first observes that back, shoulder, and ankle problems and the amputation of plaintiff's fingertips were the sole conditions identified as disabling in the Disability Report accompanying his applications for DIB and SSI benefits. See Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989). No mention was made of seizures as a basis for disability until August 30, 2006, even though plaintiff had allegedly experienced at least one seizure prior to his initial disability filing. The Court also notes that the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 129 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990). In addition, the law is clear that the burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's testimony and subjective complaints against the objective medical evidence that has been produced. Chaparro v. Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing Jones, 702 F.2d at 621 n.4). The evaluation of a plaintiff's subjective symptoms

is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court.  Harrell, 862 F.2d at 480.  The ALJ may discredit a plaintiff's subjective complaints of pain and other limitations if he carefully weighs the objective medical evidence and articulates his reasons for doing so.  Anderson v. Sullivan, 887 F.2d 630, 633 (5th Cir. 1989)(citing Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir. 1988)).

Caselaw does exist that suggests that seizures do constitute non-exertional impairments within the meaning of the Social Security Act.  See, e.g., Hardiman v. Secretary of Health and Human Services, 915 F.2d 1571, 1990 WL 143494 at *1 (6th Cir. 1990); Diaz v. Secretary of Health and Human Services, 898 F.2d 774, 777-78 (10th Cir. 1990).  The question in this case thus becomes whether the evidence pertaining to plaintiff's seizures, both in the form of the hearing testimony and the objective medical evidence which must support it, indicates that the seizures significantly limited his ability to work such that reliance on the Grids rather than VE testimony was proper.  For the reasons that follow, the Court believes that the ALJ properly analyzed the evidence pertaining to plaintiff's seizures.

Much like the claimant in Diaz, 898 F.2d at 777-78, a fair reading of the ALJ's decision reveals that he discounted the

seriousness of plaintiff's non-exertional impairments because he determined that plaintiff's credibility was suspect. First, the ALJ noted that notwithstanding the representations made in plaintiff's applications for benefits that he became disabled on November 25, 2003 and was unable to work subsequent to that date, he actually earned enough money in 2005 to constitute substantial gainful activity. (Tr. p. 12). As respects the limitations resulting from plaintiff's seizures, the ALJ observed that plaintiff was treated for that condition on only two occasions, June 22, 2005 and August 18, 2007, some two years apart, both of which were alcohol-induced or at least alcohol-related. (Tr. pp. 12-14). When consultatively evaluated by Dr. Caulfield on May 24, 2006, plaintiff's chief complaint was back pain and he specifically denied any seizure activity. (Id.). At step two of the five-step sequential analysis, the ALJ found that plaintiff suffered from severe impairments in the form of a remote history of ankle injury with tendon repair and a remote history of traumatic amputation of the tips of the second and third fingers on the left hand. (Tr. p. 15). In finding that the medical evidence failed to establish the existence of any other medically determinable "severe impairments", those which significantly limit one's physical or mental ability to do basic work activities as defined by the Regulations, 20 C.F.R. §§404.1520(c) and 416.920(c), the ALJ observed as follows:

[t]he medical evidence does not establish any other medically determinable "severe" impairment(s). The medical evidence does not reflect any continuing or objectively diagnosed seizure disorder. Claimant reported experiencing one "seizure" in 2005 while he was working. The episode (whether an actual seizure, passing out, or something else) was accompanied by an admission of frequent and recent alcohol consumption. In an initial report to the Administration at the time of application in 2006, Claimant did not allege seizures as a disabling impairment. (Ex. 1 E/1). He denied seizures when seen by the consultative examiner. His treatment records do not mention continuing seizure complaints until a few days prior to the hearing. If he were actually experiencing chronic or recurrent seizures, it is reasonable to conclude that he would have sought medical attention (since he has sought medical attention for various other reasons including skin cysts and a toothache). He sought treatment for an alleged seizure a few days before the hearing and was apparently given medication (Dilantin). However, EMS personnel reported no indication of seizure activity, and Claimant was apparently intoxicated. There is no medical evidence to indicate that Claimant was taking seizure medication prior to this time. There is no EMG or other objective evidence to indicate seizure disorder. There is no objective medical evidence or significant clinical findings to indicate significant impairment of Claimant's back or knees during the period at issue. Claimant's treatment records do not reflect continuing complaints related to the back or knees (or any other musculoskeletal complaints). There are no radiology studies to indicate degenerative processes or other disease. Claimant demonstrated full range of motion during the consultative examination with no indication of weakness or neurological impairment. There is no evidence to indicate any shoulder impairment or clinical complaint of shoulder problems. Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985); Social Security Ruling 96-3p.

(Tr. p. 13).

After recalling the hearing testimony, which included plaintiff's admissions that he continued to perform some work and

was capable of a host of other daily activities indicative of his then-present capabilities, the ALJ further opined as follows:

> [c]aimant's (and his father's) allegations concerning his symptoms and related functional limitations lack medical substantiation and credibility. While his medically determinable conditions can reasonably be expected to produce some symptoms and limitations, the weight of the evidence does not demonstrate the alleged degree and variety of symptoms and limitations. As described above, there are no objective medical findings regarding the back or other musculoskeletal areas other than a history of ankle injury. Claimant apparently retains full motion in his ankle with no weakness. He has not sought medication or treatment for ankle pain during the period at issue. He is able to walk without an assistive device. There is no objective evidence of seizure disorder. The medical evidence does not reflect significant treatment for seizures or even persistent seizure complaints. There is no evidence of significant use of seizure medication. Claimant's allegation of having taken his cousin's medication is not found to be persuasive or credible. The evidence reflects two complaints of seizure or seizure-like episodes in the past several years, both of which appear to have ben related to alcohol. The medical evidence does not indicate any persistent seizures. While suspicion is raised, the medical evidence does not establish alcohol dependence or abuse disorder. Claimant has apparently engaged in significant daily activities since the alleged onset date. He engaged in substantial gainful activity in 2005. He sought medical attention for a laceration after working with a transmission in 2005. In his testimony, he admitted to fishing with his children and lifting a 40-pound child. His alleged limitations, such as having to lie down during the day, are not supported by the medical evidence. Claimant has not sought any treatment or medication for persistent pain complaints. He has apparently not taken medication for his alleged seizures for any sustained period of time. Social Security Ruling 96-7p.

> (Tr. p. 14).

Based on the record that is before it, the Court believes that

the ALJ's assessment of the evidence was a correct one.  Simply put, the medically-supported evidence does not establish the existence of a seizure-related non-exertional impairment of sufficient magnitude so as to preclude the use of the Grids rather than VE testimony.  <u>Hardiman</u>, 1990 WL 143494 at *1; <u>Diaz</u>, 898 F.2d at 777-78.  At the time of the ALJ's decision, plaintiff was thirty years of age (a "younger person" within the meaning of 20 C.F.R. §§404.1563(c) and 416.963(c)); had an eighth grade education (a "limited education" within the meaning of 20 C.F.R. §§404.1564(b)(3) and 416.964(b)(3); and, had the residual functional capacity for medium work.  20 C.F.R. §§404.1567(c) and 416.967(c). Rule 203.25, 20 C.F.R. Subpart P, App. 2, Table No. 3, directs a finding of "not disabled".

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court,

provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this __16th__ day of ___December___, 20<u>09</u> .

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE